E-FILED
Monday, 23 November, 2020  04:18:07 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| TERRENCE HAYNES,             ) | |
|                    ) | |
|         Plaintiff,    ) | |
|                    ) | |
|      v.               ) | |
|                    ) | |
| FRANK ASTRELLA, MICHAEL   ) | |
| JENEARY, COUNTY OF KANKAKEE,   ) | Case No. 19-cv-2296 |
| KENNETH LOWMAN, SAMUEL   ) | |
| MILLER, SUSAN WAGNER, and   ) | |
| CITY OF KANKAKEE,         ) | |
|                    ) | |
|         Defendants.   ) | |
|                    ) | |

## O R D E R

Plaintiff, Terrence Haynes, filed his First Amended Complaint (#12) ("FAC") on November 21, 2019.

Before the court is Defendant Officers Kenneth Lowman, Samuel Miller, and Susan Wagner and the City of Kankakee's Motion to Dismiss (#37) and Memorandum in Support (#38), to which Plaintiff has filed a Response (#58) and Memorandum in Opposition (#59), to which Defendant Officers and City filed a Reply (#67). This Motion is fully briefed and ready for ruling.

Also before the court is Defendant Prosecutors Frank Astrella and Michael Jeneary and the County of Kankakee's Motion to Dismiss (#54) and Memorandum in Support (#55), to which Plaintiff filed a Response (#64) and Memorandum in

Opposition (#65), to which Defendant Prosecutors and County filed a Reply (#70). This Motion is fully briefed and ready for ruling.

## I.  BACKGROUND

Plaintiff alleges that in 1999, he killed a person in self-defense. Based on that incident, Plaintiff was charged with murder, convicted, and imprisoned for over eighteen years. In 2018 Plaintiff's murder conviction was vacated. In 2019 the charges against Plaintiff were dismissed and Plaintiff was awarded a certificate of innocence.

Plaintiff filed this suit pursuant to 28 U.S.C. § 1983, alleging violations of his constitutional rights. Plaintiff also brings supplemental state law claims.

### A. The Parties

Terrence Haynes is Plaintiff in this case.

Defendants Frank Astrella and Michael Jeneary were, during the relevant time, Assistant State's Attorneys employed by the Kankakee County State's Attorney's Office.

Defendants Kenneth Lowman, Samuel Miller, and Susan Wagner were, during the relevant time, police officers employed by the City of Kankakee Police Department.

### B. Facts

The facts are drawn from the FAC (#12) and are accepted as true for the purposes of this Order. *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1095 (7th Cir. 2015).

Sometime during the week of May 17, 1999, Cezaire Murrell, who had a reputation for violence, physically attacked Plaintiff in a Foot Locker store.

The following week, on May 27, 1999, Murrell told Plaintiff's brother, Jamiko Bates, to "tell 'his guys'" to pay Murrell $3,000 - $4,000 or something bad would happen. Bates relayed this threat to Plaintiff. Murrell also came to Plaintiff's residence that day, pounded on the door and screamed death threats. That same day, May 27, 1999, Murrell went to the home of Debra Williams, who observed a firearm in Murrell's waistband. Then, Murrell walked away in the direction of 516 South Greenwood, in Kankakee. Murrell told Williams he was going to confront someone over a debt.

At about 7:00 p.m. on May 27, 1999, Plaintiff, his cousin Darryl Haynes, and Willie Turner were sitting on the porch of 516 South Greenwood. Marcus Hammond, who was ten or eleven years old, was in front of the house. Gary Hammond, Jackie Speed, and two others were standing on the sidewalk leading to the porch.[1]

Murrell approached Plaintiff and demanded money in a loud, argumentative voice. Plaintiff denied owing him money. Murrell moved to physically strike Plaintiff, at which time Turner attempted to defuse the situation by walking Murrell off the porch and onto the sidewalk. Murrell raised his shirt, showed his gun to Plaintiff, and stated he was going to kill him, causing Plaintiff to pick up Gary's gun.

Suddenly, Murrell broke free from Turner and ran back toward the porch, lunging at Plaintiff while simultaneously pulling his gun from his waistband. Murrell was within four to five feet of Plaintiff and was reaching for his gun when Plaintiff

---

[1] The court will refer to Gary Hammond as "Gary" and Marcus Hammond as "Marcus" to avoid confusion. Likewise, the court will refer to Plaintiff Terence Haynes as "Plaintiff" and his cousin Darryl Haynes as "Haynes."

3

drew Gary's gun, closed his eyes and fired twice in self-defense, striking Murrell who stumbled off the porch and fell onto the grass with his gun in his hand.

Haynes, Marcus, and Speed all observed Murrell with the gun prior to the shooting and Gary observed a gun in Murrell's hand immediately after the shooting.

Turner picked up both guns and left the scene. Plaintiff also left the scene.

After the shooting, Kankakee police officers responded to 516 South Greenwood.

Defendant Officer Susan Wagner was one of the first officers on the scene. Marcus told Wagner that Murrell was armed and Plaintiff shot Murrell in self-defense. Wagner's report of the conversation omitted this information.

Marcus was then taken to the police station and interviewed by Defendant Officer Kenneth Lowman. "Marcus told Lowman that he had observed Murrell run up the stairs to the porch with his hand to his side, reaching for a weapon, and that was when Plaintiff shot Murrell."[2] Lowman wrote a statement, which Marcus signed. The statement omits any reference to Murrell having, or reaching for, a weapon. Plaintiff alleges that, instead, "Defendant Lowman's report included a statement that Plaintiff

---

[2] In his memorandum in opposition, Plaintiff contends that Marcus told Lowman that Plaintiff "acted in self-defense." (#59) at 2, citing paragraph 44 of the FAC (#12). Paragraph 44 of the FAC is quoted in its entirety in the text to which this footnote is appended, and does not allege Marcus told Lowman that Plaintiff "acted in self-defense." Nowhere else in the FAC is it alleged that Marcus told Lowman Plaintiff "acted in self-defense."

had racked the gun then fired twice at Murrell, who was not armed. Defendant

Lowman's report was false."[3]

On May 28, 1999, a Kankakee County Circuit Court Judge approved and issued

an arrest warrant for Plaintiff and set his bail at $500,000. That same day, the Kankakee

County State's Attorney's Office filed an Information charging Plaintiff with two counts

of first-degree murder for the killing of Cezaire Murrell.[4]

On June 1, 1999, Lowman spoke with Gary Hammond. Gary said that he

observed Murrell with a handgun after the shooting. Lowman created a report that

accurately reported that information.

On October 20, 1999, Lowman again spoke with Gary. Gary said he saw Murrell

reach under his shirt prior to the shooting and saw the gun in Murrell's hand

immediately after the shooting. Gary also told Lowman that the shooting was in self-

defense and Murrell had approached Plaintiff trying to shoot him. Lowman created a

report that quoted Gary as saying, "Then I heard (2) gunshots and I saw Murrell start to

fall and he grabbed the banister with one hand, holding himself up, and with the other

---

[3] Plaintiff concedes the statement Lowman wrote for Marcus does not say
Murrell "was not armed," and Plaintiff confirms he does not base any claim on the "was
not armed" language in the FAC.

[4] May 28, 1999 – the date the judge issued an arrest warrant for Plaintiff, and also
the date the State's Attorney's Office charged Plaintiff with murder, does not appear in
the FAC. Defendant Prosecutors provide this date in their Memorandum (#55) and
attach a copy of the Information and Arrest Warrant. Judicial notice of this date is
proper on a motion to dismiss, as it is easily verifiable and not subject to doubt. See *Gen.
Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997).

hand he pulled out a small black .380 out of his waistband." Lowman's report was false – Gary never said he saw Murrell pull the firearm out of his waistband after the shooting.

On June 3, 1999, Defendant Officer Samuel Miller interviewed Darryl Haynes. Haynes said that he observed Murrell "with a firearm out of his waistband" when Plaintiff fired twice. Miller created a report that quoted Haynes as saying "Terrence shot Cezaire twice before he could get the gun out of his waistband. … After Terrence shot Cezaire, Cezaire still tried to pull the gun out. That is when Terrence took the gun out of his (Cezaire's) waist band and ran." This statement, attributed to Haynes by Defendant Miller, was false.

Paragraph 53 of the FAC, which comes after Plaintiff's allegations about the Defendant Officers' reports of June 1 – October 20, 1999, alleges that based on "the falsified reports that Murrell was not armed at the time of the shooting, Plaintiff was arrested and charged with the First-Degree Murder of Murrell."[5]

Within "several days" of the shooting, and before Plaintiff was arrested,[6] Marcus met with Defendant Astrella. Marcus told Astrella that Murrell was armed, and that Plaintiff fired in self-defense. Astrella ignored Marcus' statements.

---

[5] The court again notes Plaintiff's concession that none of the reports falsely said that Murrell "was not armed," but, rather, the reports omitted various witnesses' statements that Murrell *was* armed.

[6] The fact that Astrella's meeting with Marcus happened before Plaintiff was arrested is not in the FAC. However, Defendants raise no objection to this fact. Based on the Arrest Warrant it appears Plaintiff was arrested in September 1999.

A second Assistant State's Attorney, Defendant Michael Jeneary, Marcus' first cousin, was later assigned to the Murrell murder investigation. Marcus and Jeneary saw each other at family events, including a Christmas party at a relative's house.

Jeneary told Astrella that he and Marcus were cousins. Astrella told Jeneary not to disclose the family relationship. Jenaeary and Marcus' family relationship did not become known to Plaintiff until years after his conviction.

Plaintiff alleges that, further, "prior to trial, Marcus Hammond repeated his statement to Defendants Astrella and Jeneary that Murrell had a firearm and Plaintiff acted in self-defense." Plaintiff alleges Astrella and Jeneary "instructed Marcus Hammond to lie on the stand in order to convict Plaintiff."

Plaintiff alleges that the "formation of this concealment did not occur in the prosecutorial phase of the criminal proceeding, rather, it manifested during the investigatory phase. … Jeneary's blood relationship to Marcus Hammond started long before he became a prosecutor and his attending holiday parties with Marcus was not part of the criminal proceeding."

Plaintiff's trial attorney was Jamie Boyd. Plaintiff told Boyd he shot Murrell but always maintained that he only did so to save his own life, making his entire legal defense strategy self-defense. Plaintiff alleges that Boyd was incompetent and took no steps to zealously represent Plaintiff. Boyd did not interview witnesses or request that his staff interview witnesses. Haynes and Gary would have supported Plaintiff's self-defense strategy, but Boyd did not contact them or call them as witnesses at trial.

7

Plaintiff's criminal trial commenced on August 8, 2000.

Marcus was the only eyewitness called to testify by the prosecution. He was eleven years old at the time. Marcus – per instructions from Astrella and Jeneary – falsely testified under direct questioning by Astrella that Murrell was unarmed at the time of the shooting. Astrella knew Marcus' testimony was false. Astrella further knew that multiple witnesses had given statements to the police that Murrell was armed with a gun. Nonetheless, Astrella argued throughout the trial that Plaintiff had shot an unarmed man. Astrella knew that his statements that Murrell was unarmed at the time of the shooting were false.

At trial, Marcus also testified that he had observed Plaintiff "rack" the firearm (i.e., pull back the slide to chamber the first round) prior to shooting Murrell.

Plaintiff was convicted of first-degree murder on August 16, 2000. He was sentenced to 45 years in prison on November 17, 2000.

In May 2018, following extensive postconviction proceedings, the Illinois Appellate Court vacated Plaintiff's conviction and granted Plaintiff a new trial. The bases for vacating Plaintiff's conviction included that Marcus was Jeneary's first cousin, and that Marcus had previously made statements that Murrell was not "unarmed" at the time of the shooting, both of which were concealed from Plaintiff. Plaintiff was held while the prosecutor's office decided whether to retry him. On June 3, 2019, the prosecutor's office filed a motion to dismiss the criminal charges against Plaintiff. Plaintiff was granted a certificate of innocence on November 21, 2019.

8

Plaintiff alleges six counts against Defendants, as follows:

Count I – 42 U.S.C. § 1983 Fourth Amendment claim based on fabricated evidence and concealed exculpatory evidence, subjecting Plaintiff to criminal proceedings not supported by probable cause, alleged against Lowman, Miller, Wagner, and Astrella.

Count II – 42 U.S.C. § 1983 Fourteenth Amendment Due Process claim based on fabricated evidence (Lowman), and concealed exculpatory evidence (Lowman, Miller, Wagner, Astrella, and Jeneary).[7]

Count III – Illinois common law malicious prosecution claim alleged against Lowman, Miller, and Wagner.

Count IV – Illinois common law intentional infliction of emotional distress claim alleged against Lowman, Miller, Wagner, and Astrella.

Count V – Illinois Legal Malpractice claim against Boyd, which has been voluntarily dismissed with prejudice.

Count VI – Illinois indemnification claim against the City of Kankakee and Kankakee County based on Lowman, Miller, Wagner, Astrella, and Jeneary's actions.

---

[7] FAC paragraph 112, within Count II, duplicates FAC paragraph 103, which is within Count I. That paragraph alleges a Fourth Amendment violation, and the court assumes it was duplicated in Count II in error.

## II. ANALYSIS

A. <u>Motion to Dismiss Legal Standard</u>

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Sloan v. Am. Brain Tumor Assoc.*, 901 F.3d 891, 894 (7th Cir. 2018).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Sloan*, 901 F.3d at 894. However, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012). Although a complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion, and thus, accordingly, threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice. *McReynolds*, 694 F.3d at 885. The plausibility standard calls for a "context-specific" inquiry that requires the court to draw on its judicial experience and common sense. *McReynolds*, 694 F.3d at 885.

10

B. <u>Defendant Officers' Motion to Dismiss (#37)</u>

Defendant Officers raise several challenges to the FAC. The court addresses each in turn.

1. *Whether Probable Cause or Qualified Immunity Defeat Count I*

i. Probable Cause

Count I alleges a Fourth Amendment claim for unlawful pretrial detention based on fabricated and concealed evidence. Defendant Officers first argue probable cause for Plaintiff's arrest defeats that claim. Plaintiff responds that Defendant Officers had no probable cause or, at least, the alleged fabricated and concealed evidence creates an issue that must be developed in discovery.

To state a § 1983 claim, a plaintiff must allege (1) the deprivation of a right secured by the United States Constitution or federal law and (2) that the defendants were acting under color of state law in depriving the plaintiff of that right. *Wilson v. Warren Cty., Ill.*, 830 F.3d 464, 468 (7th Cir. 2016). Defendants attack the first element.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons … against unreasonable … seizures." *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017) (*Manuel II*), quoting U.S. Const. amend. IV.

The general rule is that a seizure is "reasonable" only if it is supported by probable cause. *Manuel II*, 137 S. Ct. at 917. The Fourth Amendment protects against detention without probable cause before the start of legal proceedings. The Fourth Amendment also protects against detention after a judicial proceeding is initiated

11

(sometimes dubbed a "post-judicial process" claim) when "a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel II*, 137 S. Ct. at 918. Plaintiff's Fourth Amendment claim here challenges the constitutionality of his post-judicial process detention.

The existence of probable cause requires dismissal of a Fourth Amendment claim. *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (granting summary judgment for defendant on Fourth Amendment claim where undisputed facts showed probable cause). Although probable cause is not a high bar, *Kaley v. United States*, 571 U.S. 320, 338 (2014), determination of whether probable cause is present is often left to a jury. *Stokes v. Bd. of Educ.*, 599 F.3d 617, 623 (7th Cir. 2010).

The court in *Stokes* said, "probable cause involves the exercise of judgment, which 'turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* quoting *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993).

Probable cause "exists where the police officer is aware of facts and circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Coleman*, 925 F.3d at 350, quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence." *Coleman*, 925 F.3d at 351, citing *Askew v.*

*City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006) (finding probable cause existed to defeat Fourth Amendment claim at summary judgment).

Here, using the correct standard in viewing the evidence at this part of the proceedings, Plaintiff killed Murrell in self-defense. After doing so, Plaintiff left the scene, and someone else took Murrell's gun from the scene. When officers responded, Marcus told Defendant Officer Wagner that Plaintiff shot an armed Murrell in self-defense. Later, at the police station, still on May 27, 1999, Marcus told Defendant Officer Lowman that Murrell ran up to the porch while reaching for a weapon, then Plaintiff shot Murrell. On June 1, 1999, Lowman spoke with Gary Hammond. Gary said that he observed Murrell with a handgun after the shooting. On June 3, 1999, Officer Miller interviewed Darryl Haynes. Haynes said he saw Murrell "with a firearm out of his waistband" when Plaintiff fired twice. Finally, in October 1999 Lowman again spoke with Gary, who said he saw Murrell reach under his shirt prior to the shooting and saw the gun in Murrell's hand immediately after the shooting. Gary also told Lowman that the shooting was in self-defense and Murrell had approached Plaintiff trying to shoot him.

None of these witnesses' statements that Plaintiff acted in self-defense were included in any of the Defendant Officers' reports. And, the only report of these witnesses' statements that Murrell was armed came from Lowman's June and October interviews with Gary Hammond, where Lowman reported that Gary said he saw Murrell with a gun *after* Plaintiff shot Murrell.

13

"Probable cause hinges on the elements of the relevant criminal statute." *Mahnke v. Garrigan*, 428 F. App'x 630, 635 (7th Cir. April 13, 2011), citing *Stokes*, 599 F.3d at 622. Under Illinois law:

> (a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> > (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
> > (3) he is attempting or committing a forcible felony other than second degree murder.

720 Ill. Comp. Stat. 5/9-1(a) (West 2000).

At this stage, the court accepts as true that that these three witnesses told Defendant Officers that Murrell was armed, and that these statements were omitted or misreported. The court also accepts as true that Marcus Hammond and Gary Hammond told Defendant Officers Wagner and Lowman that Plaintiff shot Murrell in self-defense (or made similar statements that would support his defense theory of self-defense) and that these statements were also omitted from police reports.

Defendant asserts that these allegations, taken as true, when viewed along with the facts that Plaintiff undisputedly shot and killed Murrell, that Murrell was found unarmed, and that Plaintiff fled, support a finding of probable cause as a matter of law.

Plaintiff argues that because a finding of probable cause that is based on false information still violates the Fourth Amendment, and because the FAC alleges the

14

Defendant Officers fabricated reports and concealed evidence which subjected Plaintiff to pretrial detention without probable cause, a valid Fourth Amendment theory of recovery is still available here. Plaintiff cites *Manuel II*, 137 S. Ct. at 918, *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) and *Tucker v. Lally*, 2020 WL 60205, at *4 (N.D. Ill. Jan 6, 2020) in support of this argument.

The court finds *Alexander* instructive.

In *Alexander*, the defendant FBI agents sought to determine if the plaintiff, an attorney, was aware that his long-time investigator was bribing witnesses. In 2006, the defendant agents engaged two persons to record conversations with the plaintiff. The plaintiff disclaimed to those persons any knowledge that his investigator was bribing witnesses and said he would attempt to figure out what was going on. The investigation then went dormant.

Later, a new state prosecutor in the jurisdiction took office. The new prosecutor harbored a grudge against the plaintiff. The new prosecutor conspired with the defendant agents to manufacture evidence to support a bribery case against the plaintiff. The agents destroyed the 2006 recordings, set up a new meeting between the undercover persons and the plaintiff, and created a false "exit interview" with those persons that indicated the plaintiff was involved in a bribery scheme. The actual meeting was recorded, and the recording would have shown the exit interview was false, but the purported recording of the meeting that the defendant agents submitted to the FBI was blank.

Yet another recording of the plaintiff was manipulated to exclude exculpatory evidence. One of the defendant agents then personally prepared a probable cause affidavit to support a bribery charge against the plaintiff. The affidavit included the false and manipulated evidence and excluded the exculpatory evidence.

The plaintiff was charged with bribery and spent over a year in pretrial detention. The defendant agents denied the exculpatory 2006 meeting ever happened, including in depositions. The defendant agents met with and intimidated the plaintiff's witnesses causing them to falsely testify at trial. The plaintiff was nonetheless acquitted in under an hour of jury deliberations. The plaintiff then sued in federal court, alleging violations of his constitutional rights. The district court dismissed the complaint in part because the plaintiff failed to sufficiently allege that he was detained without probable cause.

The Seventh Circuit reversed, holding:

> Although the district court may have assumed that there was other, non-tainted evidence against Alexander, such an assumption is not supported by anything in the complaint. Although we acknowledge that Alexander nowhere explicitly alleged that the probable cause affidavit was based entirely on tainted information, that is a fair inference from what the complaint does say, and at this stage we are required to draw all reasonable inferences in Alexander's favor.

*Alexander*, 721 F.3d at 423.

The court will apply *Alexander* to the facts of this case shortly. First, one more instructive case.

16

Plaintiff cites *Mahnke v. Garrigan* in support of his argument that because multiple witnesses said Plaintiff fired only after being threatened by Murrell with a firearm and only when Murrell reached for the firearm, the Officer Defendants were constitutionally mandated to conduct additional investigation into the facts.

In *Mahnke*, the defendant officer received a tip regarding criminal neglect of animals. When the defendant officer went to investigate, he found emaciated horses apparently without ready access to food, shade, or water. The person ostensibly caring for the horses offered an explanation: there was food available, it was just stored elsewhere. The defendant officer considered this explanation, and rejected it, since the horses were emaciated, and the food was apparently not actually available to them.

On that record, the district court decided probable cause existed as a matter of law and the defendant officer was entitled to summary judgment. In affirming the district court, the Seventh Circuit wrote: "Although a police officer cannot consciously disregard information that would bring clarity to a confusing situation, *Askew v. City of Chicago*, 440 F.3d 894, 895–96, there is a meaningful distinction between disregarding potentially exculpatory information and disbelieving it." *Mahnke*, 428 F. App'x at 635 (comparing cases).

The court finds *Alexander* and *Mahnke* both counsel in favor of denying Defendant Officers' Motion to Dismiss.

In *Alexander*, where the district court assumed that untainted evidence supported a finding of probable cause at the motion to dismiss stage, the Seventh Circuit reversed.

17

This court believes it would commit that same mistake here if it found probable cause as a matter of law based on the facts in the FAC. The court cannot tell at this stage how great an impact the Defendant Officers' omissions and misstatements had on the overall value of the reports they produced.

Perhaps, as Defendants contend, the facts at the scene of the shooting did support probable cause. But, since the crux of the matter is the totality of the circumstances as viewed by a reasonable person, at this early stage it is improper to dismiss this claim without more factual development.

It is plausible that Defendant Officers believed Marcus, Gary, and Haynes, and intentionally buried their statements for that exact reason. If so, a reasonable person would certainly consider these statements, and, depending on the strength and believability of the statements, could find that there was no probable cause because the killing was not "unjustified" as required by the Illinois first degree murder statute.

Of course, it is also possible that Defendant Officers found these witnesses' statements unbelievable and not credible when viewed along with the other evidence at the scene and disregarded the statements for that reason.

Further, the court does not know what was presented to the judge who issued the arrest warrant, nor what was considered by the prosecutor in issuing charges. Those facts may well swing the merits of this claim in favor of either party. As but one example, were statements made to either the judge or the prosecutor that there was no indication of self-defense? That is a reasonable inference on the facts pled, since a

careful judge or prosecutor may well be interested in the answer to that exact question.

Maybe, though, all the facts *were* presented, notwithstanding Defendant Officers'

omissions, and the decision was made to pursue an arrest and charges anyway.

The court also finds helpful *Driebel v. City of Milwaukee*, 298 F.3d 622, 643–44 (7th

Cir. 2002) (granting summary judgment for defendant officers upon finding of probable

cause). In that case, the plaintiff was arrested after an investigation, though cursory,

determined that the plaintiff had committed a battery and was not acting in self-

defense. The Seventh Circuit wrote, "it is well-settled that once detectives *have performed*

*a good-faith investigation and assembled sufficient information from the totality of the*

*circumstances to establish probable cause, they are not required under the Constitution to*

*continue searching for additional evidence*."). *Driebel*, 298 F.3d at 643-44 (emphasis in

original).

Here, on the undeveloped record before it, the court cannot say Defendant

Officers engaged in a good-faith investigation, given the facts that they omitted from

their reports.

The court finds that the cases Defendant Officers cite simply do not support a

finding of probable cause, as a matter of law, based upon the current record. First,

several of the cases Defendant Officers cite were decided at the summary judgment

stage, such as *Coleman v. City of Peoria* and *Askew v. City of Chicago*. While these cases are

quite useful in demarcating the legal standards, and the court has cited them for that

purpose above, the difference in procedural posture makes these cases less useful in assessing this case at the pleadings stage.

Defendant Officers also cite *Williamson v. Curran*, 714 F.3d 432, 447-48 (7th Cir. 2013), a case where the Seventh Circuit affirmed a Rule 12(b)(6) dismissal of a false arrest claim based on the existence of probable cause. The court finds *Williamson* unhelpful. In that case, the plaintiff attached defendant deputies' reports to her complaint, and indeed relied on those reports for her arguments. While the plaintiff argued that certain informants had lied to the defendant deputies, the plaintiff did not argue the defendant deputies knew they were being lied to, nor did the plaintiff argue that the defendant deputies' reports were false or fabricated. Rather, the plaintiff argued that the deputies made the wrong call as to probable cause, in the face of conflicting evidence. On those undisputed facts, the Seventh Circuit agreed that dismissal was appropriate, because based on what the defendant deputies undisputedly knew, a reasonable person would have probable cause to arrest the plaintiff. *Id.* at 448.

Defendant Officers also cite *Neita v. City of Chicago*, 2019 WL 5682838, at *3 (N.D. Ill. Nov. 1, 2019), for the proposition that the court may dismiss a case like the one at bar at the pleadings stage if the allegations in the complaint show probable cause existed as a matter of law.

While in a certain case, i.e., *Williamson*, discussed above, a court could do so, here the court finds *Neita* supports this court's reasons for denying Defendant Officers' Motion.

20

In *Neita*, the defendant officers argued that the police reports the plaintiff had attached to the complaint plainly showed that the defendant officers had probable cause to believe the plaintiff had committed animal cruelty. The district court in *Neita* rejected that argument, because the plaintiff repeatedly disputed the accuracy of the reports, and those disputes as to the accuracy of the defendant officers' reports formed the heart of the plaintiff's claims. *Neita*, 2019 WL 5682838 at *3 ("'the existence of probable cause is a fact-based inquiry that is more properly resolved on summary judgment'"), quoting *Gay v. Robinson*, 2009 WL 196407, at *4 (C.D. Ill. Jan 27, 2009).

Defendant Officers further cite *Andersen v. Village of Glenview*, 2018 WL 6192171, at *7 (N.D. Ill. Nov. 28, 2018) as another example of a case where a district court dismissed a false arrest claim on a 12(b)(6) motion. In *Andersen v. Village of Glenview*, both the plaintiff and her ex-husband had called the police alleging harassment by the other. The plaintiff's ex-husband had provided the police with a call log showing the phone calls the plaintiff had made to him, and the police ultimately arrested the plaintiff. The plaintiff was cleared of charges and sued alleging false arrest. Relying on *Reynolds v. Jamison*, 488 F.3d 756, 761 (7th Cir. 2007), the district court agreed that the plaintiff's complaint established that the defendant officers had probable cause to arrest her for telephone harassment. *Andersen v. Village of Glenview*, 2018 WL 6192171 at *8, aff'd, *Andersen v. Village of Glenview*, -- F. App'x --, 2020 WL 4194603 (7th Cir. July 21, 2020).

21

*Andersen v. City of Glenview* is also unhelpful here. In that case, police were faced with conflicting allegations of harassment, considered a call log that supported an arrest for telephone harassment, and listened to voicemails that also established probable cause for telephone harassment. All those facts were properly before the district court.

Here, on the other hand, the same witnesses that Defendant Officers argue were unquestionably credible and believable as to Plaintiff's identity as the shooter also said that Plaintiff shot Murrell in self-defense. At this stage, the court cannot assume that the *same witnesses'* statements as to self-defense were any less credible or believable, or were so much less credible or believable that they could be omitted entirely from the Defendant Officers' reports and, essentially, ignored. On the facts pled, the court cannot draw such inferences against Plaintiff.

Defendant Officers also cite *Houston v. Village of Calumet Park*, 2019 WL 3386967 (N.D. Ill. July 26, 2019). There, a group of people including the plaintiff were standing together. A car drove up, and someone in the standing group spit on the driver of the car. The passenger got out and approached the group. Someone in the group shot and killed the person who walked up to the group. There was no indication that the shooting was justified, and witnesses identified the plaintiff as the shooter. The plaintiff was arrested and charged, and after charges were dropped, filed a federal civil rights suit alleging *inter alia* that he was held without probable cause. The plaintiff alleged the officers knew he did not commit the murder but framed him for it anyway. The district

22

court dismissed the case based on the complaint establishing the existence of probable cause. *Houston*, 2019 WL 3386967 at *4-*6.

For similar reasons as those discussed above regarding *Andersen v. Village of Glenview*, *Houston* does not counsel dismissal here. In *Houston* credible witnesses identified the plaintiff as the shooter in a murder. There was no indication the killing was justified. Here, the same witnesses who said Plaintiff shot Murrell also told police Plaintiff did so in self-defense, and for yet unknown reasons the police reported the identification but not the statements about self-defense.

Finally, Defendant Officers argue that self-defense was not "conclusively established" by the witnesses' statements, and argue that regardless, there is no duty to investigate an affirmative defense such as self-defense.

Defendant Officers' argument is unpersuasive because it relies on an inference against Plaintiff as an essential premise. The court reiterates that it is a plausible inference that the witnesses' statements *did* conclusively establish that Plaintiff acted in self-defense, rather than merely raising it as a possibility, as Defendant Officers contend. Either side may be right, but without all the facts known by the officers the court cannot fairly decide if probable cause existed or not.

This case is also distinct from cases cited by Defendant Officers where *the suspect himself* asserted he was innocent or asserted an affirmative defense. See, e.g., *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) ("probable cause does not require officers to rule out *a suspect's* innocent explanation for suspicious facts.") (emphasis added). Here

23

third-party witnesses told police that Plaintiff acted in self-defense. Defendant Officers attempt to skirt this weakness in their argument by wrapping Plaintiff and the witnesses up as a single entity, referring to the witnesses as "Plaintiff's associates." Did the Defendant Officers know the witnesses were "Plaintiff's associates," and does it even matter if the witnesses *were* "Plaintiff's associates" if they weren't themselves suspects? Without more factual development, the court cannot fairly rule on this argument.

In conclusion, the court cannot say as a matter of law that Defendant Officers had probable cause to have Plaintiff arrested and held. The court finds, accepting the allegations as true, and based on this matter being at the pleading stage, that Plaintiff has stated a claim for a Fourth Amendment violation that contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Defendants' arguments and authority cited may be reraised at a later stage in the proceedings after the record has been more fully developed "and when the applicable procedural rules permit a more fulsome and searching analysis." See *Access 4 All, Inc. v. Chi. Grande, Inc.*, 2007 WL 1438167, at *1 (N.D. Ill. May 10, 2007).

Defendant Officers' argument that probable cause exists as a matter of law is unavailing.

ii. Qualified Immunity

Defendant Officers next argue that they are at least entitled to qualified immunity on Plaintiff's Fourth Amendment claim. Plaintiff responds that more factual development is needed before the court can tell if the Defendant Officers are entitled to qualified immunity.

A defendant is entitled to qualified immunity unless they (1) violated a constitutional right and (2) the unlawfulness of their conduct was clearly established at the time of the alleged violation. *Wesby*, 138 S. Ct. at 589.

The Supreme Court has stressed that when determining entitlement to qualified immunity in the Fourth Amendment context, the particular facts faced by a defendant officer are especially important. *Wesby*, 138 S. Ct. at 590. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590, citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017).

At the pleadings stage of a case, when a party argues entitlement to qualified immunity in the probable cause context, the court faces competing maxims.

Rule 8 requires only a short and plain statement of the claim, Fed. R. Civ. P. 8(a), while, determination of the existence of probable cause is a fact specific inquiry. *Stokes*, 599 F.3d at 623. Further, to correctly assess entitlement to qualified immunity, the court must consider if a constitutional right was clearly established on the particular facts facing the defendant. *Wesby*, 138 S. Ct. at 590 (decided at summary judgment).

Therefore, a "complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Reed v. Plamer*, 906 F.3d 540, 546 (7th Cir. 2018); see also *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) ("we have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the notice pleading requirements of Rule 8.").

Here, more factual development about what Defendant Officers knew vis a vis the self-defense evidence they concealed is necessary before the court can determine whether Defendant Officers are entitled to qualified immunity. While entitlement to qualified immunity should be decided at the earliest stage possible, making that decision at the motion to dismiss stage, in this case, would be premature.

### iii. Conclusion as to Count I

Defendant Officers' Motion (#37) is DENIED as to Count I.

### 2. *Whether Probable Cause Defeats Count III (Malicious Prosecution)*

Count III alleges an Illinois state common law claim for malicious prosecution.

Lack of probable cause is a required element of an Illinois state law claim for malicious prosecution. Defendant Officers argue Count III fails for the same reasons discussed above: that the FAC establishes the existence of probable cause. See *Williams v. City of Chi.*, 733 F.3d 749, 759 (7th Cir. 2013) (malicious prosecution is offense specific and lack of probable cause must be shown for each offense charged).

For the same reasons discussed above regarding probable cause, Defendant Officers' Motion (#37) is DENIED as to Count III.

### 3. *Whether Count II States A Due Process Claim*

Count II alleges a Fourteenth Amendment due process claim based two theories, (1) withheld exculpatory evidence and (2) fabricated evidence. Defendant Officers argue Count II fails to state a claim upon which relief may be granted. Plaintiff responds that this claim is adequately pled.

#### i. *Brady* violation

To state a Fourteenth Amendment claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the complaint must allege that a piece of withheld evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material. *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).

The *Brady* disclosure requirement encompasses evidence known to the prosecutor as well as evidence known only to police investigators and not disclosed to the prosecutor. *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999).

When evidence is known to the defendant or can be accessed by an exercise of reasonable diligence, no *Brady* violation has occurred because the evidence has not been suppressed. *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

Defendant Officers do not argue that the evidence was immaterial, nor that it was not favorable to Plaintiff. Instead, they argue that they did not suppress it.

Defendant Officers first argue that "none of these alleged reporting deficiencies violated *Brady* because it was all known to Plaintiff at the time of the shooting," and Plaintiff had a duty to investigate why the police reports were inconsistent with the

27

truth known to Plaintiff. Further defining the second part of that argument, Defendant Officers argue that with reasonable diligence the evidence was accessible to Plaintiff. Plaintiff responds that Defendants' argument assumes what would have happened upon further probing by Plaintiff's criminal defense attorney.

First, the court defines the allegedly suppressed evidence it focuses on for purposes of this Order. The relevant evidence, viewing the entirety of the FAC, is not the fact that Plaintiff shot Murrell in self-defense. Plaintiff knew *that* fact, and that fact could not have been suppressed or concealed from him because he had first-hand knowledge of it. *Earnest*, 129 F.3d 510. Rather, the court is concerned with the alleged statements of Marcus, Gary, and Haynes to Defendant Officers.

These eyewitness statements were favorable to Plaintiff and could have been used as direct evidence to bolster Plaintiff's own testimony, and as to Marcus, to impeach Marcus' testimony on cross examination as a prior inconsistent statement (recall that Marcus was the only eyewitness to testify for the prosecution, and he testified that Murrell was unarmed).

The court considers Defendant Officers' argument that reasonable diligence would have revealed the statements made by these witnesses to Defendant Officers, compared to the reports of Defendant Officers. At this early juncture, the court declines to infer what would have happened if Plaintiff's criminal defense counsel had taken certain steps suggested by Defendant Officers. Development of those facts must wait for discovery.

The court also considers Defendant Officers' contention that the FAC conclusively establishes that reasonable diligence would have uncovered at least the statements of Gary and Haynes. Defendant Officers point to Plaintiff's allegations that if Plaintiff's criminal defense counsel had interviewed or called as witnesses Gary and Haynes, Gary and Haynes would have supported Plaintiff's self-defense theory.

At this early juncture, the court sees a distinction between Gary and Haynes supporting Plaintiff's self-defense theory and Plaintiff being able to discover the accurate content of the statements to the police. Gary and Haynes *may have* disputed the version of their statements that appeared in Lowman and Miller's reports, if asked. It is also entirely plausible that Gary and Haynes would have supported Plaintiff's self-defense theory but would not have disclosed their earlier statements to Lowman and Miller. Indeed, without access to the evidence Defendant Officers Lowman and Miller suppressed, if Plaintiff *had* called Gary, Haynes, or both to the stand in his defense, the prosecutor may have sought to impeach those witnesses based on Defendant Officer's reports.

Defendant Officers cite *Carvajal* for the premise that it is a criminal defendant's "responsibility to probe the witnesses and investigate their versions of the relevant events." *Carvajal*, 542 F.3d at 567. However, in *Carvajal* the plaintiff failed to explore the defendant officers' diverging versions of events when those officers were called to the stand to testify for the prosecution on a motion to suppress in the plaintiff's underlying criminal prosecution. Here, though, Gary and Haynes were not called as witnesses.

Thus, the burden of probing and investigation the plaintiff was held to in *Carvajal* is a poor fit here, on the record currently before the court.

Finally, the court considers Defendant Officers' argument that because Marcus also told Defendant Prosecutor Astrella that Murrell had a gun and Plaintiff fired in self-defense, Defendant Officers were absolved of any further duty regarding Marcus' statements to Wagner and Lowman. Defendant Officers do not cite any case law that directly supports their argument, instead citing three cases that are inapplicable: *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (cited for the principle that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."); *Coleman v. City of Peoria*, 925 F.3d at 349 (cited for the premise that "Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys – a corollary to the prosecutor's obligation to disclose such evidence to defense counsel…."); and *Goudy v. Cummings*, 922 F.3d 834, 837 (7th Cir. 2019) (cited for the principle that "officers generally discharge their *Brady* obligations by turning over such evidence to prosecutors, who in turn have a duty to disclose the evidence to the defense.").

The allegations are that Defendant Officers never turned over the accurate witness statements to the prosecution. On the facts alleged, without more development, the court cannot say that Defendant Officers discharged their *Brady* obligations. *Goudy*, 922 F.3d at 837.

In their reply brief, Defendant Officers double down on *Goudy*, citing it for their argument that once "the prosecutors have the information, no matter how it is learned, it is *their* duty, not that of the police officer, to disclose it to the criminal defendant." (#67) at 7 (emphasis in Defendant Officers' brief). Without full factual development, the court finds that Marcus' later statement to Defendant Astrella that Murrell had a gun and Plaintiff shot Murrell in self-defense does not negate Defendant Officers' obligations regarding Marcus's separate similar statements to Wagner and Lowman in the hours after the shooting. If Marcus had told Astrella that Murrell had a gun, that Plaintiff shot Murrell in self-defense, *and that* Marcus had earlier told Wagner and Lowman those facts, Defendants' argument may be stronger, but those are not the facts alleged in the FAC.

Plaintiff's Response (#59) says Astrella received "the same impeachment evidence" Marcus provided to Wagner and Lowman. Defendant Officers argue that if it is the same evidence, then Count II must be dismissed as to Defendant Officers suppressing Marcus' statements, since the prosecution had the evidence. It is unclear if the earlier statements are distinctly important, or if the crucial fact is that Marcus knew Plaintiff shot an armed Murrell in self-defense. Development of the record will allow the court to rule on the merits of Defendant Officers' argument.

31

ii. Fabricated Evidence

Government investigators violate a plaintiff's Fourteenth Amendment rights if they manufacture false evidence against the plaintiff and that false evidence is later used to deprive the plaintiff of his liberty in some way. *Whitlock*, 682 F.3d at 580.

Here, Defendant Officer Lowman interviewed Marcus at the police station. Plaintiff alleges, "Marcus told Lowman that he had observed Murrell run up the stairs to the porch with his hand to his side, reaching for a weapon, and that was when Plaintiff shot Murrell." Lowman wrote a statement, which Marcus signed. The statement omits any reference to Murrell having, or reaching for, a weapon. Plaintiff alleges that, instead, "Defendant Lowman's report included a statement that Plaintiff had racked the gun then fired twice at Murrell, who was not armed. Defendant Lowman's report was false."[8] Later, in paragraph 107 of the FAC, Plaintiff alleges "these fabricated allegations against Plaintiff caused a deprivation of liberty."

Plaintiff clarifies that he is only pursuing a Fourteenth Amendment claim based on a fabricated evidence against Defendant Officer Lowman.

Plaintiff's fabrication claim is, therefore, that Lowman wrote a statement for Marcus to sign, and that written statement falsely said Marcus saw Plaintiff "rack" the gun before shooting Murrell. Plaintiff also clarifies in his Response, as to how this

---

[8] Again, Plaintiff confirms he does not base any claim on the "was not armed" language in the FAC.

32

statement deprived him of liberty, that at trial, Marcus testified to the same false

information about Plaintiff racking the gun, on instructions from the prosecution.

Defendant Officers argue the FAC only put them on notice of a fabrication claim

related to Plaintiff's incorrect allegation that Lowman's report falsely attributed to

Marcus a statement that Murrell was not armed. Therefore, Defendant Officers argue,

Plaintiff is now presenting them with a moving target by reformulating his fabrication

claim as one related to Lowman's falsely attributing to Marcus a statement that he saw

Plaintiff rack the gun before shooting Murrell.

The FAC sufficiently pleads a fabrication of evidence claim against Lowman. It

alleges Lowman created a statement for Marcus to sign that said, "Plaintiff had racked

the gun then fired twice at Murrell, who was not armed." The FAC then alleges,

"Defendant Lowman's report was false." Later, the FAC alleges the false report caused

a deprivation of Plaintiff's liberty. The "Defendant Lowman's Report was false"

allegation is not limited to the now withdrawn "who was not armed" language. Also,

this case is still at the pleadings stage, so any confusion or "moving target" issue is of

minimal impact, and no prejudice, to Defendant Officers.

### iii. Conclusion as to Count II

Defendant Officers' Motion (#37) is DENIED as to Count II.

The court reiterates that the procedural posture of this case requires much

deference to Plaintiff's allegations. The court finds, accepting the allegations as true, and

viewing the FAC as a whole, that Plaintiff has stated a claim that contains "enough facts

to state a claim to relief that is plausible on its face." See *Twombly*, 550 U.S. at 570.
Defendants' arguments and authority cited may be reraised at a later stage in the
proceedings where the record is more fully developed "and when the applicable
procedural rules permit a more fulsome and searching analysis." See *Access 4 All*, 2007
WL 1438167, at *1.

      4. *Whether Count IV (IIED) is Timely and Otherwise Adequately Pled*

Count IV alleges a claim for intentional infliction of emotional distress pursuant
to Illinois common law.

      i. Whether Count IV is Timely

Defendant Officers argue Count IV must be dismissed as untimely. Plaintiff
argues his claim is timely because it did not accrue until his conviction was vacated and
the case terminated in his favor.

A one-year statute of limitations applies to Plaintiff's state law IIED claim. See
*Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), citing 745 Ill. Comp. Stat. 10/8-101.

The Seventh Circuit has said that "claim of intentional infliction of emotional
distress in *the course of arrest and prosecution* accrues on the date of the arrest." *Id.*, citing
*Evans v. City of Chi.*, 434 F.3d 916, 934 (7th Cir. 2006), overruled on other grounds by *Hill
v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013) (emphasis added).

However, in the context of a wrongful conviction, the Seventh Circuit has said
that where a plaintiff's state law IIED claim is inconsistent with the plaintiff's
conviction, then under the rule established by *Heck v. Humphrey*, 512 U.S. 477, 487

(1994), if that rule has been adopted by the state whose common law underpins the plaintiff's IIED claim, the claim does not accrue until the conviction has been "disposed of in a manner favorable" to the plaintiff. *Parish v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010). *Bridewell* does not discuss *Parish*, probably because *Bridewell* did not involve a wrongful conviction.

Defendants argue *Bridewell* was decided after *Parish*, so *Bridewell* controls. But, because *Bridewell* is factually dissimilar and does not even mention *Parish*, the court disagrees with Defendant Officers on this point.

Here, Plaintiff's allegations concern a wrongful conviction, like in *Parish*. And, the FAC alleges an IIED claim based on Plaintiff's wrongful conviction, rather than just his arrest and prosecution. Indeed, where Plaintiff's IIED claim alleges fabricated and suppressed evidence, if Plaintiff were to attempt to proceed with his IIED claim while his criminal case was ongoing, that action would have "cast a long shadow" over his conviction, and thus been inconsistent with *Heck*. *Hill v. Cook Cty.*, --- F. Supp. 3d ---, 2020 WL 2836773, at *16 (N.D. Ill. May 31, 2020) (discussing differences between *Bridewell* and *Parish* and finding IIED claim timely where IIED claim was filed within one year of termination of criminal case in the plaintiff's favor); *Hill v. City of Chi.*, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020), reconsidered on other grounds, 2020 WL 4226672 (N.D. Ill. July 23, 2020) (same).

Defendant Officers' argument that Count IV must be dismissed due to the statute of limitations is unavailing.

ii. Whether Count IV is Otherwise Adequately Pled

Defendant Officers also argue Count IV otherwise fails to state a claim because Plaintiff does not allege the "truly extreme and outrageous" conduct required for an IIED claim. Defendant Officers premise this argument primarily on the assumption that they will succeed with their probable cause argument. As discussed above, that argument fails at this stage.

The court instead agrees with Plaintiff's argument that where Counts I, II, and III state a claim, he has alleged sufficiently outrageous conduct to support the IIED claim. "If, as alleged, defendants fabricated false or misleading evidence of … guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently 'outrageous' to support" an IIED claim. *Carrocia v. Anderson*, 249 F. Supp. 2d 1016, 1018 (N.D. Ill. 2003); see also *Hill v. City of Chi.*, 2020 WL 509031, at *5.

Defendant Officers' Motion (#37) is therefore DENIED as to Count IV.

5. *Indemnification*

Defendant Officers finally argue that Count VI, for indemnification, must be dismissed where all underlying claims fail. However, the underlying claims are not dismissed at this stage, so Plaintiff's indemnification claim survives as well.

36

C. <u>Defendant Prosecutors' Motion to Dismiss (#54)</u>

Defendant Prosecutors, Frank Astrella and Michael Jeneary, raise several challenges to the FAC.

First, Defendant Prosecutors argue absolute prosecutorial immunity bars Plaintiff's Fourteenth Amendment due process claim (Count II) as to both prosecutors. Count II is the only claim alleged against Defendant Jeneary.

Second, Defendants argue absolute prosecutorial immunity bars Plaintiff's Fourth Amendment pretrial detention claim (Count I) against Astrella; third, alternatively, that probable cause defeats Plaintiff's Fourth Amendment claim against Astrella; fourth, alternatively, that arguable probable cause defeats Plaintiff's Fourth Amendment claim against Astrella; and fifth, alternatively, that the statute of limitations bars Plaintiff's Fourth Amendment claim against Astrella.

Sixth, Defendants argue that Plaintiff's IIED claim (Count IV) fails to state a claim against Astrella; and seventh, alternatively, that Plaintiff's IIED claim is time barred.

Plaintiff argues that to the extent Astrella and Jeneary were acting as investigators, or their involvement was otherwise a nonprosecutorial function, they are not protected by absolute immunity. Plaintiff goes on to argue that he has alleged a lack of probable cause sufficiently for his Fourth Amendment claim against Astrella to proceed, and that that claim is timely. Finally, Plaintiff argues Astrella is not absolutely immune from the IIED claim, and that that claim is timely.

37

1.  *Plaintiff's § 1983 Constitutional Violation Claims*

"A prosecutor is absolutely immune from suit for all actions and decisions

undertaken in furtherance of his prosecutorial duties." *Fields v. Wharrie*, 672 F.3d 500,

510 (7th Cir. 2012), citing *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976). "Whether or not an

action falls within the scope of his prosecutorial duties depends upon its function." *Id.*

> Prosecutors are entitled to absolute immunity for conduct that is
> "intimately associated with the judicial phase of the criminal process,"
> such as "initiating a prosecution" and "presenting the State's case." *Imbler*,
> 424 U.S. at 430–31. This also includes "the professional evaluation of the
> evidence assembled by the police and appropriate preparation for its
> presentation at trial or before a grand jury after a decision to seek an
> indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273
> (1993).
>
> By contrast, "[a] prosecutor's administrative duties and those
> investigatory functions that do not relate to an advocate's preparation for
> the initiation of a prosecution or for judicial proceedings are not entitled
> to absolute immunity." *Id.* "When a prosecutor performs the investigative
> functions normally performed by a detective or police officer, it is neither
> appropriate nor justifiable that, for the same act, immunity should protect
> the one and not the other." *Id.* (quotation marks omitted). "[T]he official
> seeking absolute immunity bears the burden of showing that such
> immunity is justified for the function in question." *Burns v. Reed*, 500 U.S.
> 478, 486 (1991). "The presumption is that qualified rather than absolute
> immunity is sufficient to protect government officials in the exercise of
> their duties." *Id.* at 486–87.

*Heidelberg v. Manias*, 2019 WL 4862069, at *9 (C.D. Ill. Mar. 26, 2019).

i. *Brady* Claim against Prosecutors Astrella and Jeneary

Defendant Prosecutors first argue that Plaintiff's § 1983 Fourteenth Amendment

due process claim, alleged in Count II, is barred by the doctrine of absolute

prosecutorial immunity.

38

Plaintiff argues absolute immunity does not shield Defendant Prosecutors, because they were not engaged in functionally prosecutorial duties when they did the alleged wrongs.

Plaintiff argues that Astrella discovered Marcus' exculpatory statement when acting as an investigator, failed to disclose that information, and should not be able to immunize his wrongdoing by later suppressing that information when he was acting as a trial prosecutor on the case. Further, Plaintiff points to his allegation that Astrella encouraged Marcus to testify untruthfully.

Plaintiff argues Jeneary's family relationship with Marcus preceded Plaintiff's prosecution and was separate from Jeneary's work as a prosecutor, Jeneary attended a family holiday party also attended by Marcus in the lead-up to Plaintiff's trial, and Jeneary encouraged Marcus to testify untruthfully.

The court finds that Plaintiff's Fourteenth Amendment due process claim, which the FAC expressly bases on suppression of exculpatory evidence as violations under *Brady v. Maryland*, 373 U.S. 83 (1963), see FAC (#12) paragraph 61, must be dismissed pursuant to the doctrine of absolute prosecutorial immunity.

A prosecutor's duty to disclose material evidence under *Brady* is an inherently prosecutorial function, intimately associated with the judicial phase of the criminal process, and thus is cloaked in absolute immunity. *Fields v. Wharrie*, 672 F.3d 505, 514 (7th Cir. 2012) (*Fields I*); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1037 (N.D. Ill. 2018)

("the relevant conduct here is the suppression of exculpatory evidence, at which point the prosecutors were functioning in their prosecutorial capacities").

Another court in this District, quoting *Fields I*, noted how a case *could* exist where a prosecutor could be responsible for a *Brady* violation, if the defendant prosecutor were an "uninvolved prosecutor in the office who ... happened upon and suppressed material evidence. Were he so, we could fairly characterize him as in the same position as ... state law enforcement officials who, during a large scale investigation ... discovered – and then suppressed – evidence which could have exculpated the plaintiff." *Heidelberg*, 2019 WL 4862069, at *12 (cleaned up).

In *Heidelberg*, a special prosecutor was appointed to handle an investigation into the plaintiff's conviction, and a second special prosecutor was appointed to handle the plaintiff's postconviction case, because of allegations of prosecutorial misconduct in the state's attorney's office that originally prosecuted the case. Nonetheless, defendant Brady, the county State's Attorney during the tenure of these special prosecutors, involved himself in the investigation and postconviction case and was alleged to have suppressed or destroyed evidence. In that context, it was inappropriate to dismiss the due process claims against Brady, because it was unclear that he was acting in a functionally prosecutorial role. *Heidelberg*, 2019 WL 4862069, at *14.

That scenario is decidedly *not* what Plaintiff alleges happened here. Plaintiff alleges Astrella discovered Marcus' exculpatory evidence while acting as an investigator, and later, along with Jeneary, instructed Marcus to lie on the witness stand

at trial. Astrella was not an uninvolved prosecutor in the office – he was ultimately the lead prosecutor on the case – and more importantly he did not "suppress" Marcus' *Brady* evidence until he was acting in his prosecutorial role and cloaked with the attendant immunity. See *Bianchi v. McQueen*, 818 F.3d 309, 319, 320 (7th Cir. 2016) (noting that "absolute immunity bars the *Brady* claim" notwithstanding allegations of investigative misconduct against the same prosecutor that were not so barred).

Plaintiff argues, "Simply put, with no probable cause save for that supported by fabricated evidence, Defendant Astrella *could not* be functioning as a prosecutor regardless of *when* he learned of that information," (#65) at pgs. 6-7 (emphasis in original), because "Prosecutors do not function as advocates before probable cause to arrest a suspect exists." *Fields I*, 672 F.3d at 512.

Without exploring the logical borders of Plaintiff's contention, suffice it to say that the cases Plaintiff cites do not stand for that broad of a premise. After all, there is "no such thing as a constitutional right not to be prosecuted without probable cause." *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (*Manuel III*) (citation omitted).

Astrella is entitled to absolute immunity for his alleged *Brady* violations.

Regarding Defendant Prosecutors' failure to disclose Jeneary's family relationship with Marcus to Plaintiff, that too was squarely a *Brady* violation subject to absolute prosecutorial immunity.

The language of the FAC makes clear that Plaintiff knew this was an issue and sought to plead around it:

Defendants Astrella and Jeneary concealed the family relationship between Defendant Jeneary and Marcus Hammond, the sole eyewitness to the shooting. The formation of this concealment did not occur in the prosecutorial phase of the criminal proceeding, rather, it manifested during the investigatory phase. In fact, Defendant Jeneary's blood relationship to Marcus Hammond started long before he became a prosecutor and his attending holiday parties with Marcus was not part of the criminal proceeding. Their actions subjected Plaintiff to an unreasonable deprivation of liberty.

FAC (#12) at paragraph 110.

Just saying that a *Brady* violation "manifested during the investigatory phase" is insufficient. Plaintiff was not entitled to exculpatory information from the prosecution until the case had entered the judicial phase, and by that point both Defendant Prosecutors were entitled to absolute immunity.

Plaintiff alleges, "…prior to trial, Marcus Hammond repeated his statement to Defendants Astrella and Jeneary that Murrell had a firearm and Plaintiff acted in self-defense. These two defendants, states attorneys who have a sacred obligation to seek justice and not merely to convict, instructed Marcus Hammond to lie on the stand in order to convict Plaintiff." FAC (#12) at paragraph 62.

The fact that Jeneary was related to Marcus before Plaintiff's prosecution started, attended family events at which Marcus was present before and possibly after Plaintiff's prosecution started, and that both prosecutors prepared Marcus to testify – even falsely – are squarely protected by absolute prosecutorial immunity. *Bianchi*, 818 F.3d at 318. The conclusory allegation that the concealment "manifested during the investigatory phase" does not change this analysis.

The FAC simply does not allege Jeneary engaged in any wrongdoing involving Marcus except during, and when preparing for, trial. Plaintiff argues that because the record is unclear as to when Jeneary's alleged misconduct occurred, the motion to dismiss should be denied, citing *Heidlberg*, 2019 WL 4862069, at *16. But, as discussed above, the court's decision in that case is not persuasive here. In this case Jeneary's misconduct – failure to disclose his family relationship to Marcus and instructing Marcus to testify falsely at trial – occurred during the judicial phase of Plaintiff's prosecution.

In sum, to the extent Plaintiff is alleging Fourteenth Amendment due process *Brady* claims against Astrella, Jeneary, or both, Defendant Prosecutors are entitled to absolute immunity. Assuming Plaintiff's allegations are true, this court does not agree with or condone Astrella and Jeneary's conduct, which harms individuals like Plaintiff as well as the reputation and credibility of the criminal justice system. But by the time Plaintiff was entitled to disclosures of exculpatory evidence from the prosecution, Astrella and Jeneary were cloaked in absolute prosecutorial immunity.

Defendant Prosecutors' Motion (#54) is GRANTED as to Count II, Plaintiff's Fourteenth Amendment due process *Brady* claim against the Defendant Prosecutors. Count II is DISMISSED.

If Plaintiff sought to allege some sort of Fourteenth Amendment due process claim against Defendant Prosecutors on a theory other than *Brady* suppression of exculpatory evidence, such a claim is not apparent from the FAC. Indeed, as noted

above, Plaintiff cites *Brady* in the FAC. However, if Plaintiff so intended, and if he

thinks such a claim exists, aside from the sort of Fourth Amendment post-judicial

process detention claim discussed elsewhere in this Order, Plaintiff may amend his

complaint again within 21 days to allege such a claim.

ii. Fourth Amendment Claims against Astrella

Defendant Prosecutor Astrella argues he is also entitled to absolute prosecutorial

immunity, or is shielded by the existence of probable cause, or arguable probable cause,

or is at least entitled to qualified immunity, on Plaintiff's Fourth Amendment claim

(Count I).

Plaintiff argues Astrella is not immune for conduct he undertook in an

investigatory role which deprived Plaintiff of his freedom, and otherwise incorporates

his arguments regarding probable cause as discussed above in the portion of this Order

dedicated to Defendant Officers.

The FAC alleges probable cause did not exist at the time the warrant and charges

were issued, and alleges the warrant and charges were based on manipulation and

obfuscation of Marcus' statements by Wagner and Lowman. Astrella is not logically

distinct from the Defendant Officers *to the extent and only to the extent he was acting in an*

*investigatory capacity* when he took Marcus' statements that Plaintiff acted in self-

defense, discouraged Marcus from repeating those statements, encouraged Marcus to

testify in accord with the false statement prepared by the Defendant Officers, prepared

charging documents knowing or with reckless indifference to the lack of probable

44

cause, and otherwise acted to cause, or to cause the continuation of, Plaintiff's confinement in the absence of probable cause.

For the same reasons discussed at length in Section B.1. of this Order, further factual development is needed as to the post-judicial process Fourth Amendment claim against Astrella. After such development, the court will be better equipped to determine whether probable cause was established, the role in which Astrella was acting, and other open questions.

Defendants' Motion (#54) is DENIED as to Count I.

### iii. Timeliness of Plaintiff's Fourth Amendment Claim against Astrella

The parties agree that Plaintiff's Fourth Amendment claim against Astrella, to the extent that it is based on Plaintiff's first term of pretrial detention, in 1999-2000, is time barred, the statute of limitations expiring in 2002, two years after his conviction. The court sees no reason to disturb the parties' agreement on this point.

However, Plaintiff contends that the second term of pretrial detention, in 2018-2019, after Plaintiff's conviction was vacated and before he was released from custody, still makes this claim timely.

Defendants reply that a claim for the 2018-2019 pretrial detention can only be properly charged against the current State's Attorney, not Astrella, because there are no allegations that Astrella had anything to do with the decision to hold Plaintiff in pretrial

detention during the second time period, and, by that point, all relevant facts had been fully brought to light through the litigation in the Illinois Appellate Court.

Defendants cite no authority for their position on this point.

"'Arguments not developed in any meaningful way are waived.'" *Martin v. Copeland*, 2019 WL 3890284, at *6 (N.D. Ind. Aug. 19, 2019), quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999). Thus, Defendants have waived this argument.

Further, the court believes this claim is timely filed, based on Plaintiff's continuous custody until within less than a year of the filing of this lawsuit. See *Manuel III*, 903 F.3d at 670 ("Once he was out of custody and could sue, Manuel's claim accrued.").

Defendants' Motion (#54) is GRANTED by agreement of the parties insofar as it argues Plaintiff's 1999-2000 pretrial detention claim against Astrella is time barred. Otherwise, on this point, Defendants' Motion (#54) is DENIED.

2. Plaintiff's IIED Claim Against Astrella (Count IV)

Defendants argue (1) Astrella is absolutely immune from Plaintiffs' IIED claim; and (2) Plaintiff's IIED claim is time barred.

Plaintiff incorporates his prior argument as to prosecutorial immunity and the statute of limitations, contending that Astrella is not immune for all of his conduct, and that *Heck* barred him from bringing this claim earlier, so it is timely.

The court declines to dismiss Count IV against Astrella.

46

Illinois prosecutorial immunity law tracks federal law on all relevant points. See
*Heidelberg*, 2019 WL 4862069, at *9.

If Astrella's acts as an investigator caused the alleged intentional infliction of
emotional distress, then Plaintiff's IIED claim is plausible. On the other hand, if Astrella
was acting as a prosecutor in the judicial phase of the case, then absolute immunity may
well shield him. It is not clear at this point when Astrella was acting as an investigator,
rather than as a prosecutor, but Plaintiff alleges enough for discovery on the issue.

Further, for the reasons stated above in Section B.5. of this Order, Astrella's
argument as to the statute of limitation on Plaintiff's IIED claim also fails.

Defendants' Motion (#54) is DENIED as to Count IV.

IT IS THEREFORE ORDERED THAT:

1)  Defendant Officers' Motion to Dismiss (#37) is DENIED as to all claims.

2)  Defendant Prosecutors' Motion to Dismiss (#54) is GRANTED as to
    Plaintiff's Fourteenth Amendment due process claim, alleged in Count II.
    Count II is DISMISSED as to Defendant Prosecutors based on absolute
    prosecutorial immunity. The only claim alleged against Defendant Jeneary
    is the due process claim alleged in Count II. Since that claim has been
    dismissed as to him, Jeneary is TERMINATED from this case. Plaintiff is
    granted 21 days to file an amended complaint if he seeks to allege some
    due process claim aside from the *Brady* claim.

3)  Defendants' Motion (#54) is GRANTED by agreement of the parties
    insofar as it argues Plaintiff's 1999-2000 pretrial detention claim against
    Astrella is time barred.

4)  Defendant Prosecutors' Motion (#54) is otherwise DENIED.

5)  This matter is referred to the Magistrate Judge for further proceedings
    consistent with this order.

ENTERED this 23rd day of November, 2020.

s/ Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE